Sewall, J.
A tract of land, described as a hundred acres, on the Penobscot River, bounding southerly thereon, but not located in any town or county, is demanded in this action. • The demand-ants allege a seisin thereof in their ancestor, one Thomas Smart, within fifty years, and in themselves, within thirty years, as his children and heirs at law ; and a disseisin done to themselves by one John Smart, and a subsequent entry by the tenants.
A part of the tract demanded the tenants undertake to defend, described in their plea as lots numbered twenty-nine and thirty, on a plan made by Charles Bnljinch, Esquire ; and of this, they say, John Smart never disseised the demandants. As to the residue of the demanded premises, there is a plea of non-tenure and disclaimer.
• The demandants have endeavored to entitle themselves to the land in controversy, under a supposed exclusive * right in Thomas Smart, their father, and in themselves as his descendants and legal representatives, by viftue of a resolve of the legislature of this commonwealth, passed on the 5th March, 1801, respecting settlers in Bangor. The legislature thereby authorize the committee on eastern lands to cause surveys to be made, and lots to be run out to settlers and their representatives ; distinguishing, for certain purposes, settlers before the year 1784 from settlers after that time, and before 1798, that is, whose occupations and improvements had commenced before those respective periods.
The facts proved, or of which there is some evidence, on the part of the demandants, are, — that the father, Thomas Smart, entered, in 1771, upon a tract of land which included the premises in controversy, made some improvements, and built a small log-house thereon, and continued there until his death in 1776; that his widow, with the demandants and others, his children, continued there a year or two longer, when they removed, leaving John Smart, the brother of Thomas, and who had entered with him in 1771, on the lot. But the demandants say that John’s entry was under Thomas, and that after his death John remained, under a paroi agreement and understanding with the -descendants of Thomas, that the possession should be continued for their use and benefit.
On the other hand, the tenants offered some evidence to prove that John entered as a coadjutor with Thomas in the disseisin, if it may be so called, or occupation of the lot claimed exclusively by the descendants of Thomas; and that when they removed, John *173 continued the occupation for himself. And it is certain that, on the 13th of April, 1784, John Smart conveyed the land in controversy, or the lot including it, to one James Budge, by a deed acknowledged and registered in 1786. And, by several mesne conveyances, the lot came, or the parts of it now in controversy, to Robert Lapish, Zadock French, * and Amasa Stetson, in different proportions; and they, being in possession on the 2d of March, 1802, obtained from John Reed and Peleg Coffin, Esquires, agents of eastern lands, a grant and confirmation of all the right, title, and interest, of the commonwealth in the said lot of land; the grant being made to them as the assignees of James Budge. The tenants claim under a deed from the said Lapish, French, and Stetson, dated the 9th of July, 1805. The demandants rely altogether on the fact in evidence, that their father, Thomas Smart, had the first occupancy of which., at present, there is any account, of the lot including the tract of land in controversy. And to avail themselves of this sort of title, it is contended for them, or in their names, that the resolve by the legislature of the 5th of March, 1801, respecting settlers in Bangor, was in itself a grant to the first occupant, which the committee of eastern lands had authority to execute according to the fact, but not otherwise; the determination of the committee being, in every case, at the peril of the person obtaining the confirmation; and that in every case of a wrong designation of the settler actually entitled as first occupant, their deed of confirmation must be null and void, as executed without authority, leaving the title created by the resolve to the person entitled by the fact of a first occupancy.
We think this construction wholly inadmissible, both as to the description of persons intended by the legislature to be the subjects of their bounty, and as to the authority of the committee or agents authorized to carry into effect this voluntary promise of the government.
As to the persons intended and designated by the term settlers there is an express legislative construction, established by the resolve of the 25th of June, 1789, to which subsequent resolves must be understood to have reference, where no contrary intention is expressed.
By that resolve, a settler, or person claiming in the right of a settler, is an occupant at the time of the grant or reservation under which he claims. By the resolve respecting * the lands in question, lots were to be surveyed off to settlers and their representatives, that is, to those who had commenced their occupancy and improvements, and entitled themselves, according to the respective periods stated in the resolve, *174 and whose occupancy had continued, by themselves or their repre sentatives, to the time of the grant. Any other construction avoids the grant itself, supposing the resolution to hare the operation contended for, from the extreme uncertainty of the persons intended to be the grantees.
This will be fully illustrated by the circumstances of this case. Thomas Smart entered in 1771, — died in 1776, — and as to this land, he and his descendants had disappeared, leaving no visible trace of their claim to it; unless the verbal communications, and supposed understanding, between them and their uncle, John Smart, may be considered as evidence of a continuation of title in real estate. This we think wholly inadmissible, and contrary to general principles and common convenience.
The argument for the demandants fails, as it respects the authorty of the committee, and the general nature of the grant in question. The agents for the commonwealth were not ex parte referees, to decide between the commonwealth and persons legally entitled to certain tracts of land. The resolve was an act of bounty, not of debt, or in performance of any contract or duty to which the commonwealth had become a party. The subjects jf this bounty are described by a term of general import, making some inquiry necessary to ascertain the individuals entitled. This inquiry, and with it the power of determining in every case, was intrusted with the committee, by the plain implication of the resolve, as well as the authority to execute a deed of confirmation in behalf af the commonwealth, to the settlers or representatives of settlers, those occupants who should be found entitled in that character, to whom lots' should be surveyed.
The construction contended for by the demandants would ren der the powers of the committee almost nugatory; * for, unless they had power to determine the person entitled, their deed to the individual would have deserved no confidence as a grant of title, since that must depend upon traditions and facts to be proved by testimony.
We think, therefore, that a power of determining upon the individual entitled, at least so far as to exclude every other individual claimant, was necessarily vested in the committee of eastern lands, to answer the purposes of the resolve in question in any manner; and that this resolve was not in" itself a grant to any person, but an authority to the committee to confirm to actual settlers and their representatives the lands in their occupancy and seisin, as an act of bounty of the legisláture, necessarily conferring upon the committee the authority to ascertain the individuals entitled.

Judgment on the verdict.